UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
MARKEESE MITCHELL,                              )
                                                )
                    Petitioner,                 )
                                                )
v.                                              )        Civil Action No. 17-11792-RGS
                                                )
STEVEN SILVA,                                   )
                                                )
                    Respondent.                 )
_____)

REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS

December 17, 2019

Boal, M.J.

On September 19, 2017, Markeese Mitchell, who is currently serving a life sentence at

the Souza-Baranowski Correctional Center, filed a Petition for a Writ of Habeas Corpus pursuant

to 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA").  Docket No. 1 (the "Petition").[1]  The Petition alleges that (1) Mitchell's

Confrontation Clause rights were violated by the admission of a redacted version of a

codefendant's incriminating statement at their joint trial and (2) Mitchell's Fifth and Fourteenth

Amendment rights were violated when he gave an involuntary statement to police without

Miranda warnings while in custody.  Docket No. 27.  For the reasons set forth below, this Court

recommends that the District Judge deny the Petition.[2]

_____

[1] Citations to "Docket No. ___" are to documents appearing on the Court's electronic docket.
They reference the docket number assigned by CM/ECF, and include pincites to the page
numbers appearing in the top right corner of each page within the header appended by CM/ECF.
[2] On April 26, 2018, the District Judge referred this case to the undersigned for a report and
recommendation on the Petition.  Docket No. 22.

1

I.      PROCEDURAL HISTORY

On May 24, 2010, a Suffolk County jury, after a joint trial, convicted Mitchell and three

codefendants of second-degree murder.  Supplemental Answer ("S.A.") 8.  The trial judge

sentenced Mitchell to life in prison.  Id.

Mitchell filed a timely notice of appeal on May 25, 2010, S.A. 8, 121, and on January 28,

2016, the Massachusetts Appeals Court ("MAC") affirmed his conviction.  S.A. 18;

Commonwealth v. Mitchell, 89 Mass. App. Ct. 13 (2016).  On February 18, 2016, Mitchell filed

an application for further appellate review with the Massachusetts Supreme Judicial Court, S.A.

378-403, which it denied on April 28, 2016.  S.A. 18.  He then filed a petition for a writ of

certiorari with the U.S. Supreme Court, which was denied on October 3, 2016.  Mitchell v.

Massachusetts, 137 S. Ct. 232 (2016).

Mitchell filed the Petition on September 19, 2017.  Docket No. 1.  On December 12,

2018, Mitchell filed a motion seeking a stay of the Petition to permit him to exhaust a claim in

the state courts.  Docket No. 29.  This Court recommended that the District Judge deny that

motion on June 12, 2019, and, on July 2, 2019, the District Judge adopted that report and

recommendation without objection.  Docket Nos. 39, 40.

II.     FACTS[3]

The MAC found the following facts:

On May 22, 2007, sixteen year old Terrance Jacobs was beaten and stabbed to
death in the Mattapan section of Boston.  Four months earlier, Jacobs had been
charged with slashing the face of one Jaleek Leary outside a local skating rink
called "Chez Vous."  Leary was fourteen years old and the defendants were
among his friends and relatives.

---

[3] Absent clear and convincing evidence to the contrary, the recitation of the facts by the MAC is
presumed to be correct.  See 28 U.S.C. § 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st
Cir. 2002); RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002).

On the afternoon of May 22, 2007, Pabon, Mitchell, and Ortiz were in the area of 10 Wilcock Street in Mattapan, drinking and smoking.  A number of other individuals were present, including the codefendant [Paul] Goode and one Dedrick Cole, who testified at the trial.  At 7:00 P.M., Richard Allen and Orlando Waters arrived and approached the group.  Waters indicated that he was part of a local gang ("M.O.B.").  Ortiz responded that someone from M.O.B. had slashed the face of his cousin, Jaleek Leary.  Ortiz sought "a fair one"—i.e., a one-on-one fistfight without weapons—in response to that attack.  Waters said that he was amenable; he returned to his vehicle and drove away.  Allen remained on the scene.  Ortiz then informed Cole that either Pabon or Emmanuel DeJesus ("Pudge") would fight the "kid" (i.e., Jacobs) who had cut Leary.

Approximately thirty minutes later, at about 7:30 P.M., and while it was still daylight, Waters returned to Wilcock Street, accompanied by two males.  Cole recognized one of the two males as a "guy I knew as Justice."  After exchanging brief words with Allen, Waters left the scene, only to return with a larger group; among them was the victim, a boy whom Cole had known as "Terra."

When the two groups faced off, Ortiz asked Waters if the fight was "on."  Ortiz pointed to Pudge as the fighter for the Wilcock Street group.  Pudge was just under six feet tall and muscular, weighing about 210 pounds.  The victim voiced some qualms about fighting Pudge.  The victim was slightly built, no more than 150 pounds, and at least four inches shorter than his opponent.  While the victim continued to express his misgivings about having to fight, Waters forcibly pushed him toward Pudge, sparking a brawl among all present.  Ortiz, Pabon, and Mitchell struck the victim in the face with their fists.  Waters and two associates initially joined the scrum but then backed off, but not before one man took out a handgun and fired three or four shots toward the crowd, prompting those assembled to flee.

The victim managed to gather himself and then ran on foot into oncoming traffic on Blue Hill Avenue.  Pabon chased after him and stabbed him in the back more than once, using a knife.  Mitchell, Ortiz, and Goode followed in pursuit.  They all turned onto Havelock Street,[4] where the chase was recorded by two surveillance cameras mounted on an establishment known as Kay's Oasis, at the corner of Havelock Street and Blue Hill Avenue.  All of the defendants were identified in the surveillance footage, which showed them running (or, in Mitchell's case, riding a bicycle) to and from the area where the victim was found lying face

---

[4] Footnote 3 of the MAC decision, inserted at this point, states: "Wilcock Street and Havelock Street are one-way parallel streets, lying side by side off Blue Hill Avenue, which is a main thoroughfare in Mattapan and Dorchester."

down, bleeding profusely.[5]  There was testimony that Mitchell stabbed the victim and then walked away "wiping the blood on a pole."  Another witness testified that Mitchell, Ortiz, and Pabon all stabbed the victim.  Still another witness testified that "[t]he person that was on the bike was ramming their bike into the person on the ground," while another person was "making a jabbing motion with [his] right hand . . . [a]nd also kicking" the victim, in the "abdomen area . . ., chest, back, stomach area."

At about 8:00 P.M., a Boston police detective came to the scene in an unmarked vehicle; he had been alerted about the street brawl by a concerned citizen.  Within a minute or two, Boston emergency medical technicians arrived, attended to the victim, and transported him to a local hospital, where he was pronounced dead. The murder weapons were not recovered.

Mitchell, 89 Mass. App. Ct. at 15-16.  The MAC also recounted[6] the following facts related to an interview that Mitchell gave at his grandfather's home approximately one month after the incident:

On June 27, 2007, Mitchell's grandfather, Timothy Johnson, returned a telephone call from a Boston police detective and agreed that the police would interview Mitchell at Johnson's home in Brockton. That same day, at about 9:05 p.m., Detectives Paul McLaughlin and Michael Devane arrived at Johnson's home in plain clothes and met with Johnson, Mitchell, and Mitchell's father, Humberto Hernandez. Mitchell was sixteen years old. The detectives told the three that, if they felt uncomfortable at all, they could end the conversation at any time and the detectives would leave. Johnson asked the detectives to sit at a kitchen table for the interview. When Mitchell joined them, the detectives told him that they were from the Boston Police Homicide Unit and assigned to the investigation of the victim's murder. Mitchell, Johnson, and Hernandez agreed to go forward with the interview.

Mitchell denied any knowledge of the incident and stated that he did not recall seeing anyone get stabbed. McLaughlin then asked to speak with Johnson and Hernandez separately, in an adjacent room, and he showed the two men photographs of Mitchell on a bicycle and on foot at the crime scene. McLaughlin indicated that Mitchell was not telling the truth about the incident. In the interim, nothing of substance was said between Devane and Mitchell at the kitchen table.

---

[5] Footnote 4 of the MAC decision, inserted at this point, states: "The surveillance cameras did not capture what happened at the location where the victim was found lying on the ground. However, he had sustained at least nineteen stab wounds."

[6] The MAC explained that it must accept these findings of fact, which a motion judge had found in connection with a motion to suppress, absent clear error.  Mitchell, 89 Mass. App. Ct. at 17.

The detectives then asked if they could make a sound recording of the remainder of the interview. Johnson, Hernandez, and Mitchell all declined.

The detectives informed Mitchell that they knew he was at least a witness to the stabbing, and they showed him a surveillance photograph depicting a young man in a red shirt on a bicycle; Mitchell admitted that he was the boy on the bicycle. Presented with a second photograph, Mitchell admitted that he was the boy in the image depicted running next to another male on a bicycle. Those photographs were taken just minutes before the victim was stabbed while he was lying close by on the sidewalk. Mitchell also confirmed that he was the boy in a red shirt seen running in two other photos. Mitchell said he could not identify anyone else in those photographs.

When the detectives showed Mitchell other surveillance photographs, he identified a "black/Hispanic" male in a green tank top as "Terrance," and said he did not know Terrance's last name. In another photo, Mitchell identified a similar male in a striped shirt as Terrance. The detectives determined that this male was Terrance Pabon.

In response to McLaughlin's observation that the surveillance video showed Mitchell running directly to the spot where the stabbing took place, Mitchell stated, "I just remember kids running." He added, "I kept running" and "I didn't see anything." Mitchell stated that he ran through a nearby yard to reach Wilcock Street. He denied taking a knife from one of the attackers and wiping the blade on an object. The detectives told Mitchell and his father and grandfather that Mitchell was not being honest about the incident and that they might need to talk with him again. The interview ended and the detectives left the home at 10:25 p.m.; Mitchell was not arrested until March, 2008.

Mitchell, 89 Mass. App. Ct. at 17-18.

III.   HABEAS CORPUS STANDARD OF REVIEW

The AEDPA presents a "formidable barrier" limiting the availability of habeas relief where state courts have adjudicated the merits of a prisoner's claims.  Mitchell cannot obtain federal habeas relief under 28 U.S.C. § 2254(d) for any claim that a state court "adjudicated on the merits" unless he can show that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Rashad, 300 F.3d at 34.  In other words, state court decisions merit substantial deference.

As the Supreme Court repeatedly has emphasized, such deference results in a federal habeas corpus standard that is "difficult to meet," with the petitioner carrying a heavy burden of proof.  Harrington v. Richter, 562 U.S. 86, 102 (2011); accord Cullen v. Pinholster, 563 U.S. 170, 181 (2011).  If a state court's decision "was reasonable, it cannot be disturbed."  Hardy v. Cross, 565 U.S. 65, 72 (2011); see Parker v. Matthews, 567 U.S. 37, 38 (2012) (emphasizing federal habeas courts may not "second-guess the reasonable decisions of state courts" (internal quotation and citation omitted)).  When applying this strict standard, a court must presume that the state court's factual findings are correct, unless the petitioner has rebutted that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); Miller–El v. Cockrell, 537 U.S. 322, 340-41 (2003).

The state court is not required to cite, or even have an awareness of, governing Supreme Court precedents, "so long as neither the reasoning nor the result of [its] decision contradicts them."  Early v. Packer, 537 U.S. 3, 8 (2002); cf. Harrington, 562 U.S. at 100 ("§ 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits'" and entitled to deference).  For a habeas petitioner to prevail under this daunting standard, the state court judgment must contradict clearly established decisions of the Supreme Court, not merely law articulated by any federal court.  Williams v. Taylor, 529 U.S. 362, 404-05 (2000); see Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).[7]

---

[7] In determining what constitutes "clearly established Federal law", petitioners can generally look to all settled federal law as of the time the state court conviction at issue became "final".  Williams, 529 U.S. at 390; see Teague v. Lane, 489 U.S. 288, 295-96 (1989).  That occurs upon the completion of (or the running of the time for filing) certiorari proceedings in the Supreme Court following state court direct review.  See Williams, 529 U.S. at 390; Teague, 489 U.S. at 295-96.  However, Supreme Court decisions issued after finality may be considered if they shed light on the meaning and application of a rule that the Supreme Court had previously established before the state court decision became final.  See, e.g., Johnson v. Bagley, 544 F.3d 592, 599 (6th Cir. 2008) (considering Supreme Court opinions that postdate state court decision on

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Williams, 529 U.S. at 405, or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different] result." Id. at 406.

The "unreasonable application" prong is satisfied if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.  When making the "unreasonable application" inquiry, federal habeas courts must determine "whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409.  An unreasonable application of the correct rule can include the unreasonable extension of that rule to a new context where it should not apply, as well as an unreasonable failure to extend the rule to a new context where it should apply. Id. at 407.  It cannot, however, include a decision by a state court not "to apply a specific legal rule that has not been squarely established by [the Supreme Court]." Knowles, 556 U.S. at 122.

## IV.   DISCUSSION

### A.   Ground One: Confrontation Clause

Mitchell alleges that the admission of his codefendant's redacted statement at their joint trial violated his Sixth Amendment Confrontation Clause rights.

#### 1.   Legal Background

The Sixth Amendment states that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him.  U.S. Const. amend. VI.  In Bruton v.

---

ineffective assistance claim because they did not rest on new law but instead applied the "clearly established" precedent of Strickland); Williams v. Allen, 542 F.3d 1326, 1338 n.7 (11th Cir. 2008) (same).

United States, 391 U.S. 123 (1968), the Supreme Court held that a criminal defendant is deprived of this right when a non-testifying codefendant's facially incriminating confession, naming the defendant as a participant, is introduced at their joint trial.  Bruton, 391 U.S. at 131.  This rule is not limited to confessions; it also proscribes the introduction of statements that are powerfully incriminating vis-a-vis a jointly tried codefendant.  United States v. O'Brien, No. 12-40026-FDS, 2014 WL 204493, at *3 (D. Mass. Jan. 17, 2014) (citing United States v. Vega–Molina, 407 F.3d 511, 520 (1st Cir. 2005)).  A Bruton error poses too great a risk to "'the practical and human limitations of the jury system'" to be cured by a limiting instruction.  United States v. Ackerly, No. 16-10233-RGS, 2017 WL 5484673, at *2 (D. Mass. Nov. 15, 2017) (citing Bruton, 391 U.S. at 135; Lee v. Illinois, 476 U.S. 530, 542 (1986)).

   In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court limited the scope of Bruton.  First, for Bruton protections to apply, an inculpatory out-of-court statement against a codefendant must be facially incriminating.  McAfee v. Roden, No. 09-10935-JLT, 2010 WL 3259145, at *6 (D. Mass. Aug. 16, 2010) (citing Richardson, 481 U.S. at 208).  Bruton does not protect out-of-court statements made by one codefendant against another that become incriminating only when linked with evidence introduced later at trial.  Id. (citing Gray v. Maryland, 523 U.S. 185, 196 (1998); Richardson, 481 U.S. at 208).  Second, to cure any hearsay or Confrontation Clause violations, a trial judge may instruct the jury not to consider the codefendant's statements against any other codefendant.  Id. (citing Bruton, 391 U.S. at 135-37; Vega Molina, 407 F.3d at 519).  If a jury is so instructed, courts assume that the jury followed the instruction and considered the statements only for the proper purpose (e.g., assessing the declarant's guilt) and not an improper purpose (e.g., assessing the codefendant's guilt).  United

States v. Figueroa-Cartagena, 612 F.3d 69, 85 (1st Cir. 2010) (citing Richardson, 481 U.S. at 206-07, 211).

In addition, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Richardson, 481 U.S. at 211.  However, "redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to Bruton's unredacted confessions as to warrant the same legal results." Gray, 523 U.S. at 195; see also Ackerly, 2017 WL 5484673, at *2.  For example, the First Circuit has found, among other things, the following to be inappropriate: replacing a petitioner's name with "Mr. X" and referring to the confession as the "redacted statement." Foxworth v. St. Amand, 570 F.3d 414, 433-35 (1st Cir. 2009).[8]

Redactions do not trigger Bruton when they incriminate only inferentially, are not apparent to the jury and give no indication that anyone other than the confessor (and a third party) were involved.  See Gray, 523 U.S. at 194-97 (discussing Richardson, 481 U.S. at 203, 208-09).  For example, a redacted statement that referred to "other individuals" or "another person" that took part in the crime did not in and of itself suggest the codefendants' guilt and was therefore not so "powerfully incriminating as to bring the Bruton proscription to bear." Vega Molina, 407 F.3d at 519, 521 (citing Richardson, 481 U.S. at 208-09).  Ultimately, the efficacy

---

[8] The Foxworth jury received a copy of the redacted statement with the phrase "Mr. X" in a different font that did not exactly fit the spaces left by the excision of the petitioner's name. Foxworth, 570 F.3d at 434.  In that case, there were only three defendants (the declarant, petitioner and a third individual) and no other suspects.  Id.  The statement unambiguously eliminated the third person from consideration, which left the petitioner.  Id.

of redactions must be determined on a case-by-case basis, paying careful attention to both a statement's text and the context in which it is offered.  Foxworth, 570 F.3d at 433.

2.    Factual And Procedural Background

After he was arrested, Mitchell's codefendant Paul Goode gave an interview to Detective Paul McLaughlin.  S.A. 4131-35.  In the interview, Goode told Detective McLaughlin that while he did not shoot or stab anybody, two of his codefendants (Pabon and Mitchell) did.  Docket No. 21-1 at 4.[9]  Goode also told Detective McLaughlin about the specific members of the Wilcock Street group who were present at the scene, including Mitchell.  Id. at 6.

Before his trial, Mitchell filed a motion to sever his case from that of his three codefendants on the grounds that the Commonwealth's expected use of Goode's statement to the police at the joint trial was a Bruton violation.  Mitchell, 89 Mass. App. Ct. at 17.  The motion judge[10] denied the motion and ordered that Goode's statement be redacted to exclude any reference to any codefendant by name.  Id.; see S.A. 89-94.  Pursuant to the judge's order, when he testified as to his recollection of Goode's statement at trial, Detective McLaughlin replaced all references to Mitchell and Pabon in his trial testimony with neutral references to an "individual" or "two people."  Detective McLaughlin specifically testified that Goode had said that he "'never shot or stabbed anyone, but that two people stabbed the victim.'"  Mitchell, 89 Mass. App. Ct. at 23 n.12.  When the trial judge asked what Goode had said with respect to "who did the stabbing," Detective McLaughlin also testified:

[Goode] stated that it was one individual who first stabbed the victim, but then was joined by another.  And he repeated that the two people did the stabbing together.  He stated that they were out of control and that they brought

---

[9] A copy of the police report containing Goode's statement is attached as Exhibit 1 to Mitchell's memorandum.  Docket No. 21-1.  That exhibit was only marked for identification at trial.
[10] The MAC explained that the motion judge was different than the trial judge.  Mitchell, 89 Mass. App. Ct. at 17.

unnecessary attention to the area.  He referred to the fact that he slapped them in the back of the head the next day for doing that . . .

***

[Goode] mentioned two particular people who had their own knives. . . He stated that when the victim was on the floor one person was stabbing him and then another person came in and began stabbing him as well.  He also stated that at the very beginning of the incident Terra and one particular individual had squared off and were ready to go in a regular fight.

S.A. 4171-72, 4180.

In addition, Detective McLaughlin omitted Mitchell's name from the list of Wilcock Street group members that Goode had stated were present at the scene.  In particular, Detective McLaughlin testified that Goode described the two groups involved in the altercation as being

Mills, Dedrick, Little D, and Pudge from Wilcock Street, and that the group with the victim included he referred to as Terra, Orlando, Justice, a gentleman that he referred to as the shooter, he didn't know his name, and Red.

S.A. 4180-81.

Here, the MAC found that the motion judge did not err in denying Mitchell's motion to sever.  Mitchell, 89 Mass. App. Ct. at 17; see S.A. 89-94.  The MAC specifically found that "there was no Bruton violation because Goode's redacted statement did not expressly, implicate, or obviously refer to the codefendants so as to be 'facially' incriminating."  Mitchell, 89 Mass. App. Ct. at 24 (citing Gray, 523 U.S. at 196-97).  It added the following: "Nor were any of the three defendants necessarily inculpated by inference from the Goode statement itself, particularly given the admittedly large number of individuals present on Wilcock and Havelock Streets that evening."  Id. (citing Commonwealth v. Vasquez, 462 Mass. 827, 843-44 (2012); Commonwealth v. Bacigalupo, 455 Mass. 485, 493 (2009)).  The MAC noted that these facts were "easily distinguished" from a different case where references to the codefendant's "friend" obviously referred to the defendant, especially because only two people were on trial for the

11

shootings.  Id. at 24-25 (discussing Bacigalupo, 455 Mass. at 493).  In the instant case, however, "the redacted statement could be considered incriminating, if at all, only when taken in context with other evidence admitted at the joint trial."  Id. at 25.  The MAC therefore explained that the "law is clear that 'inferential incrimination can be properly cured by a limiting instruction,' which the trial judge timely and forcefully delivered."  Id. (citing Commonwealth v. Rivera, 464 Mass. 56, 70 (2013)).  The MAC noted that "[b]oth at the time the redacted statement was admitted and in the final charge, the judge instructed the jury that Goode's statement must be considered solely as evidence in the case against him, and not against his codefendants."  Id. at 23.[11]

3.    Analysis

The MAC did not unreasonably apply Bruton and its progeny.  Indeed, the MAC, citing Bruton and Gray, examined the redacted statement and the context in which it was admitted, and correctly found that the redactions were neither facially nor inferentially incriminating.  Mitchell, 89 Mass. App. Ct. at 23-24.  As recounted by Detective McLaughlin, Goode stated that "two people" stabbed the victim, id. at 23 n.12, but did not expressly identify his codefendants nor place them at the scene of the crime.  There were many people present on Wilcock and Havelock Streets that night.  Id. at 24.  Therefore, the jurors would be required to draw on other evidence to link Mitchell with the "two people" that Goode's redacted statement had identified.

---

[11] Immediately before McLaughlin testified as to the details of his interview with Goode, the judge instructed the jury, inter alia, that "a statement by any of these defendants is to be considered only with respect to that defendant, not with respect to any of the other defendants." S.A. 4138.  In addition, in the final charge, the judge instructed the jury that "you may consider the statement with respect to that defendant, and again not with respect to any of the other defendants, but with respect to that defendant and rely on it as much or as little as you think proper, along with all of the other evidence in the case."  S.A. 4831.

Mitchell does not dispute that there were other people present at the time of the stabbing but maintains that his identity as one of the "two people" is obvious given that Goode's redacted statement referred to everyone other than the defendants by name.  Docket No. 21 at 12.  This argument is not persuasive.  The changes here were subtle and did not foreclose the possibility that any one of the individuals that Goode had expressly named was also one of the assailants. See Vega Molina, 407 F.3d at 521.  Nor is there evidence that the jury knew the statements were redacted.

In any event, the trial judge instructed the jury both before and after Detective McLaughlin's testimony that they should consider Goode's statement as evidence against Goode only.  Mitchell, 89 Mass. App. Ct. at 23, 25.  In the absence of powerfully incriminating evidence such as the confession in Bruton or the changes in Gray, it was not unreasonable for the MAC to presume that the jury would follow these instructions.  See Figueroa-Cartagena, 612 F.3d at 85; Mitchell, 89 Mass. App. Ct. at 25.  After careful consideration of the record, this Court finds that the MAC correctly determined that there was no error in this regard. Accordingly, this Court recommends that the District Judge deny Ground One of the Petition.

B.      Ground Two: Due Process

Mitchell also argues that he did not receive Miranda warnings prior to his custodial and involuntary interrogation in violation of the Fifth and Fourteenth Amendments.

1.      Custody

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court required that warnings alerting a person to his constitutional rights must be given prior to a custodial interrogation. Locke v. Cattell, 476 F.3d 46, 51 (1st Cir. 2007) (citing Miranda, 384 U.S. at 458).  "A person must therefore be 'in custody' before Miranda warnings are due."  Id. (citing Thompson v.

Keohane, 516 U.S. 99, 102 (1995)).  Two discrete inquiries are essential to the "in custody" determination: (1) what were the circumstances surrounding the interrogation; and (2) given those circumstances, whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave.  Id. (citing Thompson, 516 U.S. at 112).  The ultimate inquiry is whether there was a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.  Molina v. Ryan, No. 14-cv-11104, 2017 WL 506248, at *5 (D. Mass. Feb. 7, 2017) (citing Stansbury v. California, 511 U.S. 318, 322 (1994)).

The First Circuit has identified four factors to consider when making a determination of custody, including whether the suspect was questioned in familiar or at least neutral surroundings; the number of law enforcement officers present at the scene; the degree of physical restraint placed upon the suspect; and the duration and character of the interrogation.  LaFortune v. United States, No. 03-10366-PBS, 2012 WL 5389909, at *5 (D. Mass. Nov. 2, 2012) (citing United States v. Mittel–Carey, 493 F.3d 36, 39 (1st Cir. 2007)).  "This list is not exhaustive, nor is any single factor necessarily dispositive."  Id.

While any custodial interrogation entails "inherently compelling pressures," such circumstances become "more acute" when the subject of the interrogation is a juvenile.  J.D.B. v. North Carolina, 564 U.S. 261, 269 (2011).  The inclusion of a child's age in the custody analysis, when known or objectively apparent to a reasonable officer, is therefore appropriate even though that age will not necessarily be "a determinative, or even a significant, factor in every case."  Id. at 277.

The custody determination is a general test, where substantial judgment is demanded in applying the law to the facts of a given case.  Locke, 476 F.3d at 52 (citing Yarborough v.

<u>Alvarado</u>, 541 U.S. 652, 665 (2004)).  "State courts, therefore, are provided with ample leeway in reaching a reasonable decision."  <u>Id.</u> (citing <u>Yarborough</u>, 541 U.S. at 665).

        2.    <u>Voluntariness</u>

There are "two constitutional bases for the requirement that a confession be voluntary to be admitted into evidence: the Fifth Amendment right against self-incrimination and the Due Process Clause of the Fourteenth Amendment."  <u>Dickerson v. United States</u>, 530 U.S. 428, 433 (2000) (collecting cases).  The voluntariness of a confession turns on whether a defendant's will was overborne by the circumstances surrounding the giving of the confession.  <u>Id.</u> at 434.  To make this determination, courts consider "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."  <u>Id.</u> (citation omitted).

Coercive police activity that is causally related to the confession is a necessary predicate to finding that a confession is not voluntary.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986). Coercion sufficient to render statements inadmissible is not limited to brutality.  <u>LeBeau v. Roden</u>, 806 F. Supp. 2d 384, 401 (D. Mass. 2011) (citing <u>United States v. Jackson</u>, 608 F.3d 100, 102-03 (1st Cir. 2010)).  It may involve psychological duress, threats, unduly prolonged interrogation and many other circumstances, singly or in combination.  <u>Id.</u>  The voluntariness test also includes "consideration of a child's age."  <u>J.D.B.</u>, 564 U.S. at 280 (citing <u>Gallegos v. Colorado</u>, 370 U.S. 49, 53-55 (1962); <u>Haley v. Ohio</u>, 332 U.S. 596, 599-601 (1948)). Where there is no evidence of threats of violence or serious retaliation by officers and an interrogation was basically conversational, albeit lengthy, there is no basis for rendering the statement inadmissible.  <u>LeBeau</u>, 806 F. Supp. 2d at 401 (citing <u>Jackson</u>, 608 F.3d at 103; <u>United States v. Verdugo</u>, 617 F.3d 565, 575-76 (1st Cir. 2010)).

3.      Analysis

Here, the MAC did not unreasonably apply clearly established federal law in finding that

the motion judge properly denied Mitchell's motion to suppress his statement to the police.  The

MAC specifically agreed with the motion judge's reasons for denying the motion to suppress,

which the MAC recounted as follows:

> The judge noted, inter alia, that the detectives did not appear at [Mitchell's]
> grandfather's home by surprise; they had made an appointment, giving the
> defendant time to consult with two interested adults before the interview began.
> The judge indicated his awareness of the defendant's limitations, including a
> diagnosis of attention deficit hyperactivity disorder, participation in special
> education classes, and a history of substance abuse. However, despite the
> testimony of Dr. Fabian Saleh, a forensic psychiatrist called by the defendant,
> "that he seriously doubted whether the defendant had a clear understanding that
> he could voluntarily refuse to be interviewed," the judge specifically found "that
> the defendant's version of the police interview in Dr. Saleh's report [was] not
> reliable or credible." In particular, the interview with Dr. Saleh took place "more
> than a year after the defendant was arrested and indicted and more than two years
> after the police interview . . . at [a time when] the defendant had a powerful
> incentive to make his police interview sound involuntary." The judge noted that,
> "[w]hen the detectives asked to record the interview, the defendant asserted
> himself and refused. The detectives honored his refusal." Finally, throughout the
> interview, the "defendant continued to insist that he was not involved and that he
> did not see the attack. The defendant made his statements not because of any lack
> of understanding or lack of voluntariness but because he wanted to deny being
> involved in the attack. . . . The defendant's will was not overborne."

Mitchell, 89 Mass. App. Ct. at 19, n.5.  The MAC was satisfied that Mitchell's statement to the

police was not the product of a custodial police interrogation and therefore did not require a

Miranda warning.  Id. at 19 (citing Miranda, 384 U.S. at 444) (other citations omitted).  Further,

the MAC found that the motion judge correctly ruled that Mitchell's statement was voluntary and

uncoerced.  Id. (citing Commonwealth v. Tremblay, 460 Mass. 199, 207 (2011); Commonwealth

v. Sheriff, 425 Mass. 186, 192 (1997)).

These conclusions were reasonable.  The MAC essentially adopted the findings and

reasoning of the motion judge, who had considered Mitchell's age, mental capacity, familial

16

circumstances as well as the interview itself in concluding that it was noncustodial and voluntary.  Mitchell, 89 Mass. App. Ct at 19, n.5.  Several factors support the conclusion that Mitchell was not in custody, including that detectives scheduled the interview in advance; it took place at his grandfather's home with his father and grandfather present; and the detectives told all three individuals that they could end the conversation at any time if they felt uncomfortable.  Id. at 17, 19 n.5; S.A. 150-51.  All three individuals also consented to the interview, which took place almost entirely at the grandfather's kitchen table.  S.A. 151, 156.  In addition, at one point in the interview, which was approximately ninety minutes long, detectives asked if they could make a sound recording and Mitchell, his father and his grandfather all declined the request but agreed to go forward with the interview.  Mitchell, 89 Mass. App. Ct. at 17-18; S.A. 150, 152, 154.

The MAC agreed that Mitchell's "will was not overborne" because he knowingly made his statement in an effort to distance himself from the attack.  Mitchell, 89 Mass. App. Ct. at 19 n.5; S.A. 157.  And while officers told Mitchell that they did not think he was being honest, Mitchell, 89 Mass. App. Ct. at 18; S.A. 153-54, they did not act in an overtly coercive manner.  Instead, the atmosphere was conversational and nonthreatening.  See S.A. 151-54.  In sum, the state courts did not err in finding that the interview was noncustodial and voluntary.[12]  Mitchell therefore has failed to establish grounds for habeas relief based on his statement to the police.

---

[12] Mitchell understandably focuses on his age at the time of the interview, which the MAC did not address.  Docket No. 21 at 17-20.  However, the MAC was not required to expressly explain how Mitchell's age factored into its analysis.  See O'Laughlin v. O'Brien, 568 F.3d 287, 300 (1st Cir. 2009) ("[S]tate courts are not required to supply the specific reasons that a federal court thinks are most persuasive for upholding the judgment.").  The MAC adopted the motion judge's reasoning.  Mitchell, 89 Mass. App. Ct. at 19, n.5.  The motion judge explicitly included Mitchell's age as one of the factors he analyzed.  S.A. 150, 155.

V.      <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that the District Judge deny Petitioner

Markeese Mitchell's Petition for Writ of Habeas Corpus in its entirety.

VI.     <u>REVIEW BY DISTRICT JUDGE</u>

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any

party who objects to these proposed findings and recommendations must file specific written

objections thereto with the Clerk of this Court within 14 days of service of this Report and

Recommendation.  The written objections must specifically identify the portion of the proposed

findings, recommendations, or report to which objection is made, and the basis for such

objections.  <u>See</u> Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised

that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to

comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's

order based on this Report and Recommendation.  <u>See</u> <u>Phinney v. Wentworth Douglas Hosp.</u>,

199 F.3d 1 (1st Cir. 1999); <u>Sunview Condo. Ass'n v. Flexel Int'l, Ltd.</u>, 116 F.3d 962 (1st Cir.

1997); <u>Pagano v. Frank</u>, 983 F.2d 343 (1st Cir. 1993).


                                                        /s/ Jennifer C. Boal_____
                                                        JENNIFER C. BOAL
                                                        United States Magistrate Judge